**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| **HASHEM NADER SEHWAIL**        ) | |
| ) | |
| Plaintiff,        ) | **Case No.  3:18-cv-00158-MMH-MCR** |
| ) | **Hon. Marcia Morales Howard** |
| ) | |

HASHEM NADER SEHWAIL                    )
                                       )
          Plaintiff,                   )     **Case No.  3:18-cv-00158-MMH-MCR**
                                       )     **Hon. Marcia Morales Howard**
                                       )
                                       )
**CHISTOPHER A. WRAY**, Director of the )
Federal Bureau of Investigation, in his official )
capacity;                              )
                                       )
**CHARLES H. CABLE, IV**, Director of the )
Terrorism Screening Center, in his official )
capacity;                              )
                                       )
**DAVID P. PEKOSKE**, Administrator,   )
Transportation Security Administration )
(TSA), United States Department of     )
Homeland Security (DHS), in his official )
capacity;                              )
                                       )
**KEVIN K. MCALEENAN**, Acting Commissioner )
United States Customs and Border Protection; )
in his official capacity, and,         )
                                       )
**RUSSEL TRAVERS**, Acting Director of the )
National Counterterrorism Center, in   )
his official capacity;                 )
                                       )
          Defendants.                  )
_____/

**VERIFIED AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

Plaintiff, **Hashem Nader Sehwail**, by and through his attorneys, CAIR National Legal

Defense Fund, Inc. ("Council on American-Islamic Relations" or "CAIR") and the Council on

American-Islamic Relations, Florida ("CAIR-FL"), states as follows:

1

**Introduction**

1.      Our federal government is imposing an injustice of historic proportions upon people such as Plaintiff Hashem Nader Sehwail —who has not been arrested, charged, or convicted of any type of terrorism-related offense—as well as thousands of other Americans. Through extra-judicial and secret means, the federal government is ensnaring innocent Americans into an invisible web of consequences that are imposed indefinitely and without recourse because of the shockingly large federal terror watch list that now includes hundreds of thousands of individuals.

2.      Indeed, many Americans, including children, end up on this secret federal terror watch list – which the Defendants have named the Terrorist Screening Database ("TSDB") – based on mere guesses, hunches, and conjecture, and even simply based on matters of race, ethnicity, national origin, religion or the exercise of their constitutional rights.

3.      These consequences include the inability to fly on airplanes, to go through security without having all screeners receive a message for the remainder of a listee's life that he is a "known or suspected terrorist," to obtain licenses, to exercise their Second Amendment right to own a firearm, and to be free from the unimaginable indignity and real-life danger of having their own government communicate to hundreds of thousands of federal agents, private contractors, businesses, state and local police, the captains of sea-faring vessels, and foreign governments all across the world that they are a violent menace.

4.      And unfortunately, the federal government has designed its No Fly List to be accountability-free.  Persons placed on the federal terror watch list have no means of challenging the constitutionality of their listing.  Indeed, people on the federal terror watch

lists only learn of their placement when they feel the web of consequences burdening their lives and aspirations, and they never learn the circumstances that led to their listing.

5.     Media accounts have made clear that the secret federal terror watch list is the product of bigotry and misguided, counterproductive zeal.  Americans are dumped onto the watch list without being charged with or convicted of a crime, or in some stomach-churning cases, even subject to an ongoing investigation.

6.     Instead, two recently leaked government documents and a governmental report, which include the March 2013 Watchlisting Guidance (Exhibit 1), the Directorate of Terrorist Identities (DTI): Strategic Accomplishments 2013 (Exhibit 2), and the Department of Justice's March 2014 Audit of the Federal Bureau of Investigation's Management of Terrorist Watchlist (Exhibit 3) reveal that the care the federal government takes in creating its federal terror watch list is void of proper processing, which in turn results in life-altering consequences that flow from these illegal actions.

7.     In fact, upon information and belief, Dearborn, a city of less than 100,000 and a place Arab Americans and Muslim Americans have called home for generations, contains the second highest concentration of Americans on the federal government's watch list. Moreover, there have been more than 1.5 million nominations to the federal terror watch list since 2009 and that, in 2013 for example, the Terrorist Screening Center converted 98.96 percent of those nominations into watch list placements.

8.     Upon information and belief, evidence also shows that the federal government uses guilt-by-association presumptions to place family members and friends of listed persons on the watch list.

3

9.      Moreover, travel to Muslim majority countries—travel that American Muslims are very likely to engage in—is also a basis for watch list placement.

10.     In 2009, the federal government made 227,932 nominations to its federal terror watch list.  In 2013, that number more than doubled at an alarming and dangerous rate to 468,749.

11.     Recently, a federal court judge observed in *Gulet Mohamed v. Eric R. Holder, Jr.*, et al. (United States District Court, Eastern District of Virginia, Case No. 11-cv-00050 (2011)), that "[a] showing of past or ongoing unlawful conduct does not seem to be required, but the Court has little, if any, ability to articulate what information is viewed by TSC as sufficiently 'derogatory' beyond the labels it has provided the Court.  In sum, the No Fly List assumes that there are some American citizens who are simply too dangerous to be permitted to fly, no matter the level of pre-flight screening or on-flight surveillance and restraint, even though those citizens cannot be legally arrested, detained, or otherwise restricted in their movements or conduct." *See* United States District Court, Eastern District of Virginia, Case No. 11-cv-00050 (2011); Dkt. 70 at 19; attached as Memorandum Opinion (Exhibit 4).

12.     Moreover, the Court went on to find that "[i]nclusion on the No Fly List also labels an American citizen a disloyal American who is capable of, and disposed toward committing war crimes, and one can easily imagine the broad range of consequences that might be visited upon such a person if that stigmatizing designation were known by the general public... The process of nomination to the No Fly List is based on a suspected level of future dangerousness that is not necessarily related to any unlawful conduct." *See* United States District Court, Eastern District of Virginia, Case No. 11-cv-00050 (2011); Dkt. 70 at 14, 17; attached as Memorandum Opinion (Exhibit 4).

13. Further, the Court in *Elhady, et al., v. Piehota, et al.*, United States District Court, Eastern District of Virginia, Case No. 1:16-cv-375, recently held that the "'central meaning of procedural due process'" is that "[p]arties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.'" *See* United States District Court, Eastern District of Virginia, Case No. 1:16-cv-375 (2016); Dkt. 47 at 15; attached as Memorandum Opinion (Exhibit 5). The Court went on to state that the "Government's 'trust us' approach is inconsistent with the fundamental procedural protections applicable to the deprivation of a protected liberty interest, including the right to be heard." *See* United States District Court, Eastern District of Virginia, Case No. 1:16-cv-375 (2016); Dkt. 47 at 16; attached as Memorandum Opinion (Exhibit 5).

## Parties

14. Plaintiff Hashem Nader Sehwail is a citizen of the United States. Defendants placed Plaintiff on the No Fly List after he left the United States in 2017 thereby preventing him from boarding a flight to return home. Plaintiff is a resident of West Palm Beach, Florida. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district, which is where Plaintiff attempted to fly home.

15. Defendant Christopher A. Wray is the Director of the Federal Bureau of Investigation ("FBI"). Defendant Wray is responsible for the nominations of Plaintiff and other similarly situated American citizens to the federal terror watch list. Defendant Wray is being sued in his official capacity, only.

16. Defendant Charles H. Cable, IV is the Director of the Terrorist Screening Center ("TSC"). Defendant Cable was appointed in April 2013. Defendant Cable develops and maintains the federal government's consolidated Terrorism Screening Database (the "watch

5

list"), and accepted the nominations of Plaintiff and other similarly situated American citizens to the federal terror watch list.  Defendant Cable also oversees the dissemination of the stigmatizing label attached to Plaintiff and other similarly situated American citizens of "known or suspected terrorists" to state and local authorities, foreign governments, corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, the captains of sea-faring vessels, among other official and private entities and individuals.  Defendant Cable is being sued in his official capacity, only.

17.    Defendant David P. Pekoske is Administrator of the Transportation Security Administration ("TSA").  Defendant Pekoske oversaw the dissemination of the stigmatizing label attached to Plaintiff and other similarly situated American citizens of "known or suspected terrorists" to state and local authorities, foreign governments, corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, the captains of sea-faring vessels, among other official and private entities and individuals.  Defendant Pekoske is being sued in his official capacity, only.

18.    Defendant Kevin K. McCaleenan is Acting Commissioner of the United States Customs and Border Protection ("CBP").  Defendant McCaleenan is responsible for receiving and implementing the federal terror watch list.  Defendant McAleenan is being sued in his official capacity, only.

19.    Defendant Russel Travers is Acting Director of the National Counterterrorism Center ("NCTC").  Defendant Travers is responsible for the nominations that resulted in the placement of Plaintiff and other similarly situated American citizens on the federal terror watch list.  Defendant Travers is being sued in his official capacity, only.

**Jurisdiction and Venue**

6

20.     Under U.S. Const. Art. III §2, this Court has jurisdiction because the rights sought to be protected herein are secured by the United States Constitution.  Jurisdiction is proper pursuant to 28 U.S.C. § 1331, *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), *et seq.*, 5 U.S.C. § 702, 5 U.S.C. § 706, the United States Constitution, and federal common law.

21.     This action seeks declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § § 2201-02, Rules 57 and 65 of the Federal Rules of Civil Procedure, and pursuant to the general, legal, and equitable powers of this Court.

22.     A substantial part of the unlawful acts alleged herein were committed within the jurisdiction of the United States District Court for the Middle District of Florida.

23.     Venue is proper under 42 U.S.C. § 1391(e) as to all Defendants because Defendants are officers or employees of agencies of the United States sued in their official capacities and because this judicial district is where a substantial part of the events or omissions giving rise to the claims occurred.

## Factual Background

### The Federal Government's Terrorist Watch List

24.     In September 2003, Attorney General John Ashcroft established the Terrorist Screening Center ("TSC") to consolidate the government's approach to terrorism screening. The TSC, which is administered by the FBI, develops and maintains the federal government's consolidated Terrorism Screening Database (the "watch list").  TSC's consolidated watch list is the federal government's master repository for suspected international and domestic terrorist records used for watch list related screening.

7

25.     The watch list has two primary components: the Selectee List and the No Fly List.  Persons on the Selectee List are systematically subject to extra screening at airports and land border crossings, and often find "SSSS" on their boarding passes printed by airline employees which is marked to indicate a passenger's watch list status to airline employees and screeners.  Persons on the No Fly List, including Plaintiff, are prevented from boarding flights that fly into, out of, or even through United States airspace.

26.     Defendant TSC disseminates records from its terrorist watch list to other government agencies that in turn use those records to identify suspected terrorists.  For example, applicable TSC records are provided to TSA for use by airlines in pre-screening passengers and to CBP for use in screening travelers entering the United States by land.

27.     Upon information and belief, Defendants disseminated the records of Plaintiff from their terrorist watch list to other government agencies, including Defendant TSA for use by airlines in pre-screening Plaintiff, and Defendant CBP for use in screening Plaintiff upon entering the United States.

28.     Upon information and belief, Defendants disseminated the records pertaining to Plaintiff from their terrorist watch list to foreign governments with the purpose and hope that those foreign governments will constrain the movement of Plaintiff in some manner.

29.     Upon information and belief, Defendants' intention in disseminating watch list records, including those of Plaintiff and similarly situated American citizens, as widely as possible is to constrain their movements, not only within the United States, but abroad as well.  For example, some countries detain individuals listed on the federal terror watch list who enter their borders, question those individuals at the behest of United States officials, or altogether prevent those individuals from even entering those countries.

30.    Thus, while the TSC maintains and controls the database of suspected terrorists, it is the front-line agencies like the TSA that carry out the screening function.  In the context of air travel, when individuals make airline reservations and check in at airports, the front-line screening agency, like TSA and CBP, conducts a name-based search of the individual, including that of Plaintiff, to determine whether he is on a watch list.

31.    While agencies throughout the federal government utilize the federal terror watch list to conduct screening, listed persons are subject to a comprehensive portfolio of consequences that cover large aspects of their lives.

32.    Indeed, Defendants disseminated the federal terror watch list to government authorities, private corporations and individuals with the purpose and hope that these entities and/or individuals will impose consequences on those individuals Defendants have listed, including Plaintiff.

33.    Upon information and belief, the status of Plaintiff and similarly situated American citizens as known or suspected terrorists on the federal terror watch list diminishes and even imperils their ability to access the financial system.

34.    Defendants have provided access to the federal terror watch list, and banks have closed the bank accounts of individuals listed on the federal terror watch list and financial companies have declined to allow some listed individuals to make wire transfers.

35.    Moreover, upon information and belief, family-based immigration applications filed by Plaintiff and similarly situated American citizens are delayed indefinitely due to an "FBI name check" and not adjudicated, thereby denying Plaintiff and similarly situated American citizens of the rights that flow from citizenship, including the ability to sponsor lawful permanent residency for immediate relatives living abroad.

36.     Among the entities and individuals to which the federal government disseminates its federal terror watch list are state and local authorities, foreign governments, corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, and captains of sea-faring vessels, among others.

37.     In fact, in 2015, former Director of the Terrorist Screening Center Christopher Piehota gave an exclusive interview to CNN and stated the following, in relevant part:

> It's concerning that our partners don't use all of our data. We provide them with tools. We provide them with support, and I would find it concerning that they don't use these tools to help screen for their own aviation security, maritime security, border screening, visas, things like that for travel.[1]

38.     Former TSC Director Piehota went on to state that the United States shares its federal terror watch list with the European Union, but that European Union countries don't systematically utilize it to identify suspected terrorists or screen migrants coming.

39.     Upon information and belief, because the names of Plaintiff and similarly situated American citizens are included on the federal terror watch list, their names were disseminated to state and local authorities, foreign governments, corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, the captains of sea-faring vessels, among other official and private entities and individuals.

40.     Because the federal government disseminates its federal terror watch list to foreign governments, listed persons, including Plaintiff and similarly situated American citizens, are often not allowed to enter other nations.  This is because the United States is

---

[1] First on CNN: Top U.S. intel official: Europe not taking advantage of terror tracking tools, CNN, *available at*: http://www.cnn.com/2016/04/07/politics/christopher-piehota-us-intel-europe-terror-tracking/

telling other nations, without any modicum of due process, that thousands of its own citizens are "known or suspected terrorists."

41.    The federal government, through Defendants, disseminates its federal terror watch list to state and local police officers which allows those officers to query the names of persons, including Plaintiff, if for example, the listed individual is pulled over for routine traffic violations.

42.    Disseminating the federal terror watch list to state and local police officers creates a dangerous situation insofar as the federal terror watch list effectively directs state and local officers to treat thousands of Americans, including Plaintiff, charged with or convicted of no crime yet who are listed as a "known or suspected terrorist" as extremely dangerous.

43.    With the advent and deployment of automatic license plate readers by police departments across the country, local and state authorities have relied heavily upon a driver's watch list status as the basis of a traffic stop, including Plaintiff and similarly situated American citizens.

44.    Being on the federal terror watch list can prevent listed persons, including Plaintiff and similarly situated American citizens and lawful permanent residents, from purchasing a gun. For example, New Jersey passed a law in 2013 that banned persons on the federal terror watch list from owning guns. Additionally, Connecticut is in the process of setting up an institutional mechanism to prevent individuals whose names are included on the federal terror watch list, such as Plaintiff, from being able to buy a gun in the state of Connecticut.

11

45.    Accordingly, Plaintiff and similarly situated American citizens are unable to purchase guns in states that ban persons on the federal terror watch list from owning guns.

46.    Because the federal government conducts a security risk assessment that includes querying the federal terror watch list prior to issuing a license to commercial drivers to transport hazardous materials, being on the federal terror watch list can prevent listed persons, including Plaintiff and similarly situated American citizens, from obtaining or renewing their Hazmat license.

47.    Being on the federal terror watch list can also prevent listed persons, including Plaintiff and similarly situated American citizens, from accompanying minors or passengers with disabilities to their gate, from working at an airport, or working for an airline insofar as listed persons are not allowed to enter so-called "sterile areas" of airports.

48.    Being on the federal terror watch list can also result in the listing of the false stigmatizing label of "known or suspected" terrorist on the criminal records of Plaintiff and similarly situated American citizens and lawful permanent residents, information that is publicly accessible to the general public.

49.    Defendants make the federal terror watch list available to municipal courts, which then make bail determinations based on an individual's status on the watch list.

50.    Being on the federal terror watch list can also result in the listing of the false stigmatizing label of "known or suspected" terrorist on the criminal records of Plaintiff and similarly situated American citizens, information that is publicly accessible to the general public.

51.    Being on the federal terror watch list can also result in the denial or revocation of a Federal Aviation Administration (FAA) license of Plaintiff and similarly situated American citizens.

52.    Although TSA, CBP, and other agencies may use the records provided by the TSC, it is the TSC that maintains and controls the database of suspected terrorists.

53.    Two government entities are primarily responsible for "nominating" individuals for inclusion in the terrorist watch list—Defendants NCTC and FBI.  The NCTC, which is managed by the Office of the Director of National Intelligence, relies on information from other federal departments and agencies when including alleged known or suspected international terrorists in its Terrorist Identities Datamart Environment ("TIDE") database. The NCTC reviews TIDE entries and recommends specific entries to the TSC for inclusion in the watch list.  TIDE is the main source of all international terrorist information included in the watch list.

54.    Defendant FBI, in turn, nominates to the watch list individuals with what it characterizes as suspected ties to domestic terrorism.

55.    Defendant TSC makes the final decision on whether a nominated individual meets the minimum requirements for inclusion into the watch list as a known or suspected terrorist.  TSC also decides which screening systems will receive the information about that individual.

56.    Former Director of the Terrorism Screening Center Healy has testified that in evaluating whether an individual meets the criteria for inclusion on the consolidated watch list, the TSC determines whether the nominated individual is "reasonably suspected" of having possible links to terrorism.  According to the TSC, "reasonable suspicion requires

articulable facts which, taken together with rational inferences, reasonably warrant the determination that an individual is known or suspected to be or has been engaged in conduct constituting, in preparation for, in and of or related to terrorism and terrorist activities."

57.    Defendants have not stated publicly what standards or criteria are applied to determine whether an American citizen on the consolidated watch list will be placed on the No Fly List, Selectee List ("SSSS") or other list that is distributed to the TSA, CBP or other screening agencies.

58.    The standards for watch list inclusion do not evince even internal logic. Defendants define a "suspected terrorist" as an "individual who is reasonably suspected to be, or have been, engaged in conduct constituting, in preparation for, in aid of, or related to terrorism and terrorist activities based on articulable and reasonable suspicion."  In other words, Defendants place American citizens on the federal terror watch list based upon a "reasonable suspicion" that they are "reasonably suspected" of nefarious activities.  This "reasonable suspicion" based on a "reasonable suspicion" standard does not even contain internal logic.

59.    The federal government utilizes guilt-by-association as a basis for watch list inclusion.  For example, the immediate relative of listed persons can be listed without any derogatory information—other than the bonds of family.  Nonetheless, such designation suggests that the immediate relative is him or herself engaged in nefarious activities.

60.    Being a known associate—a friend, colleague, fellow community member, etc.—of a listed individual can also provide a basis for watch list inclusion.

14

61.     Even if an American citizen is acquitted of terrorism charges or those charges are otherwise dismissed, the federal government retains for itself the authority to continue to include them in the watch list.

62.     For reasons unknown, Defendants also place what they call "non-investigatory subjects" on the federal terror watch list, American citizens that they have chosen not to investigate.

63.     Defendants place individuals on the federal terror watch list without any information regarding an individual's intended target.

64.     Defendants place individuals on the Selectee List without any information that they pose a threat to aviation.

65.     Defendants place individuals on the No Fly List without any information that they pose a threat to aviation.

66.     Under these practices and standards, the number of records in the consolidated watch list has swelled.  Over 1.5 million nominations to the watch list have been submitted by federal agencies since fiscal 2009.

67.     In 2013, Defendant TSC accepted 98.96 percent of all nominations made.

68.     Because of these loose standards and practices, the federal terror watch list's rate of growth has increased.  In fiscal 2009, there were 227,932 nominations to the watch list.  In fiscal 2013, there were 468,749 nominations.

69.     Upon information and belief, in 2001, there were 16 people who the federal government systematically prevented from flying.  In 2013, that number increased to 47,000.

70.    Once an American citizen has been placed on the watch list, the individual remains on the list until the agency that supplied the initial information in support of the nomination determines the individual should be removed.

71.    A 2007 GAO report found that TSC rejects only approximately one percent of all nominations to the watch list.[2]    As such, the watch list is growing at a rate of approximately 20,000 entries per year.

72.    At a March 10, 2010 Senate Homeland Security Committee hearing, Russel E. Travers, Deputy Director of the National Counterterrorism Center, stated that "[t]he entire federal government is leaning very far forward on putting people on list," and that the watch list is "getting bigger, and it will get even bigger."

73.    The federal terror watch list disproportionately targets American Muslims.

74.    Defendants have utilized the watch list, not as a tool to enhance aviation and border security, but as a bludgeon to coerce American Muslims into becoming informants or forgoing the exercise of their rights, such as the right to have an attorney present during law enforcement questioning.

75.    Public examples of this phenomenon abound. *See Latif v. Holder,* 2014 U.S. Dist. LEXIS 85450, *19 (D. Or. June 24, 2014) (an FBI agent told Steven Washburn that he "would help remove Washburn's name from the No Fly List if he agreed to speak to the FBI"); *Id.* at *21-22 (FBI agents told Ibraheim Mashal that "his name would be removed from the No Fly List and he would receive compensation if he helped the FBI by serving as an informant."): *Id* at *22-23 (FBI agents offered Amir Meshal "the opportunity to serve as a

---

[2] *See* United States Government Accountability Office Report to Congressional Requesters entitled *Terrorist Watch List Screening:  Opportunities Exist to Enhance Management Oversight, Reduce Vulnerabilities in Agency Screening Processes, and Expand Use of the List*, GAO-08-110, October 2007, at 22.

16

government informant in exchange for assistance in removing his name from the No Fly List."). *See also Fikre v. FBI,* 2014 U.S. Dist. LEXIS 73174 (D. Or. May 29, 2014) (Emirati officials told Yonas Fikre that he "could not travel to the United States by air because he is on the No Fly List" and an FBI agent told Fikre that "the FBI could take steps to remove [him] from the No Fly List if he agreed to be an informant."); *Tanveer v. Holder, et. al.,* No. 13-cv-6951, Dkt. 15 (April 22, 2014) (Naveed Shinwari "declined to act as an informant for the Federal Bureau of Investigation and to spy on [his] own American Muslim communities and other innocent people.").

76.     Almost all publicly known instances of Americans being placed on the watch list regard Muslims or persons who could be mistaken for Muslims.

77.     Additionally, government records show that Dearborn, Michigan—which is 40 percent Arab—is disproportionately represented on the federal terror watch list.  In fact, Dearborn is among the top five cities in the country, alongside Chicago, Houston, New York, and San Diego, represented on the federal terror watch list.

78.     Due to Dearborn's significant population of Muslims, it has earned a reputation as the "Muslim Capital of America."

79.     Defendants' 2013 Watchlisting Guidance also indicates that "[t]ravel for no known lawful or legitimate purpose to a locus of terrorist activity" can be a basis for being listed.  While a "locus of Terrorist Activity" is not defined by the document, upon information and belief, it likely includes any place where many Muslims reside.

80.     The federal terror watch list's inclusion standards are so permissive and pliable and the selectee list's efficacy is at best fleetingly marginal that the inclusion standards themselves violate Plaintiff's procedural and substantive due process.

17

81.     The federal terror watch list diminishes, rather than enhances, our national security because the number of innocent Americans on the list is becoming so voluminous that the purpose of having a list is significantly undermined as all are being treated as the same.

82.     The consequences of being on the federal terror watch list are meted out publicly.  Members of the public can witness the extra screening to which individuals on the federal terror watch list are subject, oftentimes in front of family and colleagues, including being pulled out of their car at gunpoint, being ordered to leave their vehicle with their hands held above their head, among other stigmatizing measures.

83.     Because travel is regularly done with family, friends, and community and professional contacts, a person's watch list status is revealed to travel companions.  Travel companions come to learn of a person's watch list status based on how screeners treat a listee.

84.     In practice, frontline screeners disclose the status of individuals on the federal terror watch list to state and local authorities, as well as airline employees.

85.     The operation of the federal terror watch list enlists air carriers to assist the federal government in tracking passengers on the federal terror watch list.

86.     Defendants apply the federal terror watch list against Muslim Americans in a manner that is different from how they use their list against people of other faith backgrounds.

87.     Defendants use impermissible and inaccurate religious profiles in compiling the federal terror watch list.

88.     Defendants who contributed to the placement of Plaintiff and similarly situated American citizens on the federal terror watch list knew that their actions violated clearly established federal law.

89.     Defendants knew at the time they acted unlawfully that Supreme Court precedent required that, whenever a citizen is deprived of a liberty interest, the federal government must at least provide the deprived with some form of notice that a deprivation occurred.

### The Federal Government's Terrorist Watch List
### Is No More Effective Than a List of Randomly Selected Individuals

90.     Defendants' ability to watch list persons who pose a threat of terrorism, can be measured and described using a quantitative analysis based on factual allegations made in this Complaint as well as publicly available information describing the current operation of the federal terror watch list.

91.     Upon information and belief, the federal government has placed approximately one million persons on the federal terror watch list over the last ten years.

92.     Moreover, based on the University of Maryland's Global Terrorism Database, a project funded in part by the Department of Homeland Security, there have been fewer than 250 terrorist acts inside the United States over the last decade.  These terrorist acts were perpetrated by fewer than 250 persons.

93.     Only one of these perpetrators was designated on the federal terror watch list by the federal government prior to their criminal conduct.  This single person designated on the federal terror watch list, however, was removed from the federal terror watch list prior to perpetrating the terrorist attack.

19

94.     Upon information and belief, in order to designate a person on the federal terror watch list, the federal government must first have information about that person. Because the federal government does not possess information on every person in the world, existing law enforcement and intelligence practices produce a subset of persons who the federal government can then screen against the federal terror watch list's inclusion standards.

95.     The precise size of this subset is unknown, however a survey of law enforcement and intelligence practices indicates that the size of this subset is greater than 50 million people.

96.     Upon information and belief, the practices that produce this subset exclude some persons who do pose a threat of terrorism and include some persons who do not pose a threat of terrorism.

97.     Upon further information and belief, the federal government does not screen the entire subset of people known to it.  Moreover, Defendants do not make individual determinations as to whether each person about whom they know should be placed on the federal terror watch list.

98.     In order to designate a person on the federal terror watch list, a federal government official must make a nomination and a TSC official must accept the nomination.

99.     Upon information and belief, TSC officials accept nominations at a rate above 95 percent.

100.    Based on the facts alleged in this Complaint and the publicly known processes of the federal terror watch list, a quantitative analysis can be constructed to measure and describe the performance of the federal terror watch list.

101.    A quantitative analysis demonstrates that, in order to accomplish the federal terror watch list's stated objectives, Defendants must have at least some greater-than-random ability to identify future terrorists.  This is due to the nature of the processes Defendants utilize to place persons on the federal terror watch list and the size of the population Defendants can—if they so choose—screen against the federal terror watch list's inclusion standards.

102.    A quantitative analysis also demonstrates that Defendants' watch listing system would perform similarly if inclusion on the watch list was done via random selection instead of the existing inclusion standards Defendants utilize.

103.    A quantitative analysis therefore indicates that Defendants have no ability to watch list persons whose placement on the watch list would further Defendants' stated objectives.

**Inadequacy of the DHS Traveler Redress Inquiry Program Process**

104.    The government entities and individuals involved in the creation, maintenance, support, modification and enforcement of the federal terror watch list, including Defendants, have not provided travelers, including Plaintiff and similarly situated American citizens, with a fair and effective mechanism through which they can challenge the TSC's decision to place them on the terrorist watch list.

105.    An individual, including Plaintiff and similarly situated American citizens, who has been prevented or hindered from travel by being placed on the federal terror watch list has no clear avenue for redress, because no single government entity is responsible for removing an individual from the list.  The TSC, which is administered by the FBI, does not accept redress inquiries from the public, nor does it directly provide final disposition letters

to individuals on the selectee list or similarly situated American citizens, who have submitted redress inquiries.  The NCTC which manages the TIDE list does not accept redress inquiries from the public.

106.    Individuals who seek redress after having been included in the terrorist watch list must submit an inquiry through the DHS Traveler Redress Inquiry Program ("DHS TRIP").  DHS TRIP provides individuals with a "Redress Control Number."

107.    DHS TRIP is the only redress "process" available to individuals included on the terrorist watch list.

108.    DHS TRIP submits traveler complaints to the TSC, which determines whether any action should be taken.  The TSC has not provided any publicly available information about how it makes that decision.  The TSC is the final arbiter of whether an individual's name is retained on or removed from the watch list, including those of Plaintiff and similarly situated American citizens.

109.    The TSC makes a determination regarding a particular individual's status on the watch list, including Plaintiff and similarly situated American citizens, and DHS in turn responds to the individual with a standard form letter that neither confirms nor denies the existence of any terrorist watch list records relating to the individual.  The letters do not set forth any basis for inclusion in a terrorist watch list, nor do they state whether the government has resolved the complaint at issue.

110.    The government does not provide an American citizen with any opportunity to confront, or to rebut, the grounds for his or her possible inclusion on the watch list.  As such, DHS TRIP offers no meaningful review of the watch list designation and in effect shields

the TSC's actions with respect to the individual nominations or classes of nominations from meaningful review by any independent authority.

111.    Moreover, the government's own internal audits of the system point to serious flaws.  For example, a March 2008 DOJ Office of the Inspector General report entitled *Audit of the U.S. Department of Justice Terrorism Watchlist Nomination Processes* found significant problems with the nomination and removal process.

112.    Thus, the only "process" available to such individuals is to submit their names and other identifying information to a government entity that has no authority to provide redress and to hope that an unspecified government agency corrects an error or changes its mind.

113.    Plaintiff is a US citizen.

114.    Plaintiff has not been arrested, charged, nor convicted of a terrorism-related offense.

### Plaintiff Hashem Nader Sehwail

115.    Plaintiff Hashem Nader Sehwail (hereinafter "Mr. Sehwail") is a United States citizen who lives in Florida.

116.    Last year, Mr. Sehwail left the United States to visit and spend time with his family in Palestine.

117.    On January 21, 2018, Mr. Sehwail appeared at Istanbul Atatürk Airport (IST), in order to board his flight back home to the United States.

118.    Mr. Sehwail had previously purchased a plane ticket for a Turkish Airlines flight from Istanbul, Turkey to Hartsfield-Jackson Atlanta International Airport (ATL), and

on to Miami International Airport (MIA) in Florida.  Plaintiff's flight itinerary is attached as **Exhibit 6**.

119.    Mr. Sehwail presented himself at the Turkish Airlines counter with plenty of time prior to his flight, when a Turkish Airlines representative informed Mr. Sehwail that he was no longer allowed to board his flight.

120.    In response to an inquiry as to why he was being denied boarding, the Turkish Airlines representative directed Mr. Sehwail to the U.S. Embassy to obtain information as to why he is no longer permitted to board a flight back to his home in the United States.

121.    Mr. Sehwail requested information from the United States Embassy in Istanbul, Turkey regarding why he was denied boarding and being prevented from returning to his home in the United States.

122.    However, the United States Embassy informed Mr. Sehwail that they had no information regarding why he was being denied boarding.

123.    Upon information and belief, Mr. Sehwail was added to the No Fly List after he left the United States, and accordingly he is unable to board a flight to return to his home in the United States.

124.    Mr. Sehwail filed the instant action on January 25, 2018.

125.    On January 30, 2018, counsel for Plaintiff provided counsel for the U.S. Department of Justice a copy of the initial complaint and Mr. Sehwail's itinerary for his February 5, 2018 flight.  E-mail notifying U.S. DOJ of Mr. Sehwail's complaint and itinerary is attached as **Exhibit 7**.

126.    On February 2, 2018, counsel for the U.S. Department of Justice e-mailed Plaintiff's counsel stating that Plaintiff's flight was booked on a codeshare flight operated by

24

a foreign carrier.  According to the U.S. DOJ, Plaintiff's flight must not be a codeshare flight operated by a foreign carrier.  U.S. DOJ's e-mail is attached as **Exhibit 8**.

127.   Mr. Sehwail did not received any such correspondence from the U.S. Embassy prior to booking his February 5, 2018 flight back to the U.S.

128.   Notably, Mr. Sehwail cannot find a flight out of Jordan that is not a codeshare flight operated by a foreign carrier.  Mr. Sehwail has no other means of leaving Jordan to return to his home in Florida.

129.   On February 5, 2018, Mr. Sehwail attempted to return to the United States for a second time.  Mr. Sehwail was scheduled to fly from Jordan to Jacksonville International Airport.  See Plaintiff's flight itinerary for February 5, 2018, attached as **Exhibit 9**.

130.   When Mr. Sehwail arrived at the airport in Jordan to board his flight, he was once again denied boarding.

131.   Mr. Sehwail has already spent significant sums on cancellation and rebooking fees caused by Defendants refusal to allow him to board a flight to his country of citizenship.

132.   Mr. Sehwail has rebooked his flight from Amman, Jordan to Frankfurt, Germany, to New York, New York, to Jacksonville, Florida.  Mr. Sehwail's flight from Amman, Jordan to Frankfurt, Germany takes off on Monday, February 12, 2018.  That flight is operated by Lufthansa and is flight LH-693.  Mr. Sehwail's flight from Frankfurt to New York is scheduled for Monday, February 12, 2018, and is operated by United Airlines and is flight UA-961.  Plaintiff's February 12, 2018 itinerary is attached as **Exhibit 10**.

133.   Upon information and belief, Mr. Sehwail will be denied boarding for a third time.

134.   Mr. Sehwail is an employee at a retail establishment in Florida.  His inability to return to the United States is putting his employment in jeopardy.  Mr. Sehwail's livelihood is at stake.

135.   Upon information and belief, Mr. Sehwail was added to the No Fly List after he left the United States, and accordingly he is unable to board a flight to return to his home in the United States.

136.   At no time was Mr. Sehwail given notice of the factual basis for his placement on the federal terror watch list, and at no time was he offered a meaningful opportunity to contest his designation.

137.   Moreover, at no time was Mr. Sehwail given notice of the deprivation of his liberty interests or violation of his constitutional rights.

138.   Upon information and belief, Mr. Sehwail's nomination to and designation on the federal terror watch list was made based solely upon a hunch (based upon his race, ethnicity, national origin, religious affiliation, guilt-by-association, or First Amendment protected activities).

139.   Upon information and belief, because Mr. Sehwail is included on the federal terror watch list, and specifically the No Fly List, Defendants disseminated and are continuing to disseminate his designation as a "known or suspected terrorist" to state and local authorities (including the local police officers above), foreign governments, corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, among other official and private entities and individuals.

## COUNT I
## DEPRIVATION OF PROTECTED LIBERTIES IN VIOLATION OF FIFTH AMENDMENT RIGHT TO SUBSTANTIVE DUE PROCESS

### (Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)

140.   The foregoing allegations are realleged and incorporated herein.

141.   Plaintiff and other similarly situated American citizens learned that they were placed on the federal terror watch list subsequent to being added on the federal terror watch list and sought to challenge such placement.

142.   Defendants' actions as described above in refusing to provide Plaintiff and other similarly situated American citizens with any notice at all of their placement which deprived Plaintiff and other similarly situated American citizens of constitutionally protected liberty interests.

143.   Defendants' actions in nominating Plaintiff and other similarly situated American citizens to the federal terror watch list blatantly violate the requirement that "'nominations' must not be solely based on race, ethnicity, national origin, religious affiliation, or First Amendment protected activities."  49 U.S.C. § 114(h)(3).

144.   Plaintiff and other similarly situated American citizens have a liberty interest in traveling free from unreasonable burdens that are not reasonably tailored within, to, and from the United States, through land border crossings and over U.S. air space.

145.   Plaintiff and other similarly situated American citizens have a right to be free from false government stigmatization as individuals who are "known or suspected to be" terrorists, or who are otherwise associated with terrorist activity, when such harm arises in conjunction with the additional consequences that follow from being listed as well as the deprivation of their right to travel on the  same terms as other travelers and/or the

27

deprivation of their liberty interest under the Fifth Amendment in travel free from unreasonable burdens.

146. Plaintiff and other similarly situated American citizens have a liberty interest in nonattainder (ie: the interest against being singled out for punishment without trial). Defendants' actions have singled out Plaintiff and others similarly situated for punishments that include, but are not limited to, inability to travel by air and unreasonable burdens placed upon traveling by air to and from the United States, over U.S. air space and at land border crossings, and false association with a list of individuals suspected of terrorism.

147. Plaintiff and other similarly situated American citizens, having been prevented from boarding on commercial flights or entering the United States at land border crossings, having had their bank accounts closed, having been prevented from making wire transfers at financial institutions, having had their citizenship applications delayed indefinitely due to an "FBI name check," having lost lucrative economic opportunities and suffering from other forms of financial harm, having been prevented from test driving or purchasing vehicles at a car dealership, and having sought to challenge their placement on the federal terror watch list, are entitled to a constitutionally adequate legal mechanism that affords them notice of the reasons and bases for their placement on the federal terror watch list and a meaningful opportunity to contest their continued inclusion on the federal terror watch list. Defendants have even failed to provide the most basic ingredient of due process, which is notice that the government has deprived a person of their protected rights.

148. Moreover, Defendants have officially imposed on Plaintiff and other similarly situated American citizens the stigmatizing label of "known or suspected terrorists" without a constitutionally adequate legal mechanism.

28

149.    Further, Defendants disseminated the stigmatizing label attached to Plaintiff and other similarly situated American citizens of "known or suspected terrorists" to state and local authorities, foreign governments, private corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, the captains of sea-faring vessels, among other official and private entities and individuals.

150.    By imposing on Plaintiff and other similarly situated American citizens the stigmatizing label of "known or suspected terrorists" and by failing to provide Plaintiff and others similarly situated with a constitutionally adequate legal mechanism, Defendants have deprived Plaintiff and other similarly situated American citizens of their protected liberty interests, including but not limited to their liberty interests in traveling, freedom from false stigmatization, and nonattainder, and thus violated the constitutional rights of Plaintiff and other similarly situated American citizens without affording them due process of law and will continue to do so into the future if Plaintiff and other similarly situated American citizens are not afforded the relief demanded below.

WHEREFORE, Plaintiff request this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

## COUNT II
### DEPRIVATION OF PROTECTED LIBERTIES IN VIOLATION OF FIFTH AMENDMENT RIGHT TO SUBSTANTIVE DUE PROCESS

### (Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)

151.    The foregoing allegations are realleged and incorporated herein.

29

152.    Because Plaintiff and other similarly situated American citizens were listed by Defendants in a manner not narrowly tailored to a compelling interest, Defendants' actions as described above in including Plaintiff and other similarly situated American citizens on a watch list that unreasonably burdens or prevents them from boarding commercial flights or entering the United States at land border crossings, are arbitrary and capricious, lack even a rational relationship to any legitimate government interest, and have unduly deprived Plaintiff of constitutionally protected rights, including their liberty interests in travel, freedom from false stigmatization, and nonattainder.

153.    Defendants' actions in nominating Plaintiff and other similarly situated American citizens to the federal terror watch list blatantly violate the requirement that "'nominations' must not be solely based on race, ethnicity, national origin, religious affiliation, or First Amendment protected activities."  49 U.S.C. § 114(h)(3).

154.    By placing Plaintiff and other similarly situated American citizens on the federal terror watch list, Defendants have placed an undue burden on their fundamental right of movement.

155.    By placing Plaintiff and other similarly situated American citizens on the federal terror watch list, Defendants have treated Plaintiff like second-class citizens.

156.    Defendants' watch list lacks a compelling interest insofar as their true purpose is to provide law enforcement with a tool to coerce American Muslims into becoming informants.

157.    Defendants' watch lists are also not narrowly tailored insofar as the federal terror watch lists are entirely and demonstrably ineffectual and obvious alternatives exist.

30

158.    Defendants' actions in placing Plaintiff and other similarly situated American citizens on the federal terror watch list, officially imposing on Plaintiff and other similarly situated American citizens the stigmatizing label of "known or suspected terrorists," and disseminating the stigmatizing label to state and local authorities, foreign governments, private corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, the captains of sea-faring vessels, among other official and private entities and individuals, without a constitutionally adequate legal mechanism, are arbitrary and capricious, shock the conscience, violate the decencies of civilized conduct and are so brutal and offensive that they do not comport with the traditional ideas of fair play and decency.

159.    Plaintiff and other similarly situated American citizens, having been burdened or prevented from boarding on commercial flights or entering the United States at land border crossings, having had their bank accounts closed, having been prevented from making wire transfers at financial institutions, having had their citizenship applications delayed indefinitely due to an "FBI name check," having lost lucrative economic opportunities and suffering from other forms of financial harm, having been prevented from test driving or purchasing vehicles at a car dealership, and having sought to challenge their placement on the federal terror watch list, are entitled to a constitutionally adequate legal mechanism that affords them notice of the reasons and bases for their placement on the federal terror watch list and a meaningful opportunity to contest their continued inclusion on the federal terror watch list.  Defendants have even failed to provide the most basic ingredient of due process, which is notice that the government has deprived a person of their protected rights.

160.    Because Plaintiff and other similarly situated American citizens have not been charged with any crimes and are United States Citizens, Plaintiff challenge their placement and the placement of others similarly situated American citizens on the federal terror watch list on a broad, as-applied basis.

161.    Plaintiff's substantive due process challenge is also facial, as there are no circumstances where their placement or the placement of others similarly situated on the federal terror watch list is narrowly tailored to achieve any compelling government interest.

162.    Defendants have thus violated Plaintiff's constitutional rights and the constitutional rights of other similarly situated American citizens without affording them due process of law and will continue to do so into the future if Plaintiff and other similarly situated American citizens are not afforded the relief demanded below.

WHEREFORE, Plaintiff requests that this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

## COUNT III
## UNLAWFUL AGENCY ACTION IN VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. §§ 702, 706

### (Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)

163.    The foregoing allegations are realleged and incorporated herein.

164.    Defendants' actions in placing Plaintiff and other similarly situated American citizens on the federal terror watch list, officially imposing on Plaintiff and other similarly situated American citizens the stigmatizing label of "known or suspected terrorists," and disseminating the stigmatizing label to state and local authorities, foreign governments,

32

corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, the captains of sea-faring vessels, among other official and private entities and individuals, without a constitutionally adequate legal mechanism, were and are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and contrary to constitutional rights, power, privilege, or immunity, and should be set aside as unlawful pursuant to 5 U.S.C. § 706.

165.    Defendants' actions in nominating Plaintiff and other similarly situated American citizens to the federal terror watch list blatantly violate the requirement that "'nominations' must not be solely based on race, ethnicity, national origin, religious affiliation, or First Amendment protected activities."  49 U.S.C. § 114(h)(3).

166.    Defendants' failure to provide Plaintiff and other similarly situated American citizens, who have been unreasonably burdened or denied boarding on commercial flights or entering the United States across the border and sought to challenge their placement on the federal terror watch list, with a constitutionally adequate mechanism that affords them notice of the reasons and bases for their placement on the federal terror watch list and a meaningful opportunity to contest their continued inclusion on the federal terror watch list is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and contrary to constitutional rights, power, privilege, or immunity, and should be set aside as unlawful pursuant to 5 U.S.C. § 706.

167.    Because Plaintiff and other similarly situated American citizens do not present a security threat to commercial aviation, Defendants' actions as described above in including Plaintiff and other similarly situated American citizens on the federal terror watch list that unreasonably burdens or prevents them from boarding commercial flights or entering the

United States across the border, are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and contrary to constitutional rights, power, privilege, or immunity, and should be set aside as unlawful pursuant to 5 U.S.C. § 706.

168.    By placing Plaintiff and other similarly situated American citizens on the federal watch list, Defendants caused them an actual, imminent and irreparable injury that cannot be undone through monetary remedies.

169.    Plaintiff and other similarly situated American citizens are not required to exhaust the DHS TRIP process, under the holding in *Darby v. Cisneros*, 509 U.S. 137 (1993). *See* United States District Court, Eastern District of Virginia, Case No. 11-cv-00050 (2011); Dkt. 70 at 22; attached as Memorandum Opinion (Exhibit 4).

WHEREFORE, Plaintiff requests this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

**COUNT IV**
**VIOLATION OF THE FIFTH AMENDMENT**
**TO THE UNITED STATES CONSTITUTION**
**(Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)**

**(Equal Protection)**

170.    The foregoing allegations are realleged and incorporated herein.

171.    Defendants' actions in placing Plaintiff and other similarly situated American citizens on the federal terror watch list, officially imposing on Plaintiff and other similarly situated American citizens the stigmatizing label of "known or suspected terrorists," and disseminating the stigmatizing label to state and local authorities, foreign governments, private corporations, private contractors, airlines, gun sellers, car dealerships, financial

institutions, the captains of sea-faring vessels, among other official and private entities and individuals, without a constitutionally adequate legal mechanism are discriminatory and constitute an action that targets religious conduct for distinctive treatment.

172.    Defendants' actions in nominating Plaintiff and other similarly situated American citizens to the federal terror watch list blatantly violate the requirement that "'nominations' must not be solely based on race, ethnicity, national origin, religious affiliation, or First Amendment protected activities."  49 U.S.C. § 114(h)(3).

173.    By placing Plaintiff and other similarly situated American citizens on the federal terror watch list, Defendants have treated Plaintiff and other similarly situated American citizens like second-class citizens.

174.    Defendants' above-described actions were motivated by the religious status of Plaintiff and other similarly situated American citizens and on the basis of the constitutionally-protected free exercise of religion of Plaintiff and other similarly situated American citizens.

175.    Defendants' above-described actions have had a discriminatory effect upon and have disparately impacted Plaintiff and other similarly situated American citizens who are Muslim American travelers, and not travelers of other faiths.

176.    Defendants' above-described actions, policies, course of conduct, or pattern of practice that mandate or permit the above-described treatment of Plaintiff and other similarly situated American citizens does not serve a compelling state interest or a legitimate or public purpose, nor are they the least restrictive means or narrowly tailored to achieve any such interest.

WHEREFORE, Plaintiff requests this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

## COUNT V
## VIOLATION OF THE UNITED STATES CONSTITUTION

### (Non-Delegation)

177.    The foregoing allegations are realleged and incorporated herein.

178.    Congress has not provided the Executive Branch with intelligible principles from which the Executive can implement its watch list schemes regarding civil aviation and national security.

179.    Congress has not directed the Executive Branch to create either a No-Fly List or a Selectee List.

180.    Congress has not authorized the Executive Branch to utilize the federal terror watch list to encourage financial institutions to close bank accounts or ban wire transfers, to encourage car dealerships to restrict test drives or purchases of vehicles, or state and local law enforcement to detain individuals based on their watch list status.

181.    Congress has not authorized the Executive Branch to disseminate the terror watch list to local and state authorities, foreign countries, private corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, the captains of sea-faring vessels, among other official and private entities and individuals.

182.    The Executive Branch's assignment of the watch listing function to TSC violates Congress' directive that TSA determine who belongs on federal terror watch lists and the consequences that flow from being on those lists.

183.     Congress has not delegated to TSA the authority to create a process that can culminate in the removal of individuals from the TSDB.

184.     In the alternative, Congress's delegation to TSA to create a redress process is defective because the Executive Branch has allocated watch list authority in a manner that prevents TSA from creating a redress process.

185.     As a result, Defendants have illegally acted beyond their authority.

WHEREFORE, Plaintiff request this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

## Prayer for Relief

WHEREFORE, Plaintiff respectfully requests:

1.     A declaratory judgment that Defendants' policies, practices, and customs violate the Fifth Amendment to the United States Constitution and the Administrative Procedure Act;

2.     A declaratory judgment that Defendants' policies, practices, and customs violate the non-delegation doctrine of the United States Constitution;

3.     An injunction that:

a.     requires Defendants to remedy the constitutional and statutory violations identified above, including the removal of Plaintiff from any watch list or database that burdens or prevents him from flying or entering the United States across the border; and,

b.      requires Defendants to provide individuals designated on the federal terror watch list with a legal mechanism that affords them notice of the reasons and bases for their placement on the federal terror watch list and a meaningful opportunity to contest their continued inclusion on the federal terror watch list;

4.      A trial by jury;

5.      An award of attorneys' fees, costs, and expenses of all litigation, pursuant to 28 U.S.C. § 2412; and,

6.      Such other and further relief as the Court may deem just and proper.

Respectfully submitted,

/s/ Omar Saleh
Omar Saleh, Esq.
Florida Bar No.: 91216
8076 N. 56th Street
CAIR, Florida, Inc.
Tampa, Florida 33617
Phone: (813) 514-1414
Facsimile: (813) 987-2400
Email: osaleh@cair.com

Thania Diaz Clevenger, Esq.
Florida Bar No.: 97301
CAIR, Florida, Inc.
8076 N. 56th Street
Tampa, Florida 33617
Phone: (813) 514-1414
Facsimile: (813) 987-2400
Email: tclevenger@cair.com

38

Lena F. Masri, Esq.
Pro hac vice application forthcoming
DC Bar No.: 1000019
CAIR National Legal Defense Fund
453 New Jersey Ave, SE
Washington, DC 20003
Phone: (202) 488-8787
Facsimile: (202) 488-0833
Email: lmasri@cair.com

Gadeir I. Abbas, Esq.*
Pro hac vice application forthcoming
VA Bar No.: 81161
CAIR National Legal Defense Fund
453 New Jersey Ave, SE
Washington, DC 20003
Phone: (202) 488-8787
Facsimile: (202) 488-0833
Email: gabbas@cair.com

*Licensed in VA, not in DC
Practice limited to federal matters*

Date:  February 6, 2018                    *Counsel for Plaintiff*

## VERIFICATION

Under penalty of perjury I declare that I have read the foregoing Complaint and the facts alleged therein are true and correct to the best of my knowledge and belief.

By:_____

Printed Name: Hashem Nader Sehwail

Dated: February___7___, 2018.

Respectfully submitted,

_____
Thania Diaz Clevenger, Esq.
Florida Bar No.: 97301
CAIR, Florida, Inc.
8076 N. 56th Street
Tampa, Florida 33617
Phone: (813) 514-1414
Facsimile: (813) 987-2400
Email: tclevenger@cair.com

Omar Saleh, Esq.
Florida Bar No.: 91216
8076 N. 56th Street
CAIR, Florida, Inc.
Tampa, Florida 33617
Phone: (813) 514-1414
Facsimile: (813) 987-2400
Email: osaleh@cair.com